INSITUFORM TECHNOLOGIES, INC., Insituform (Netherlands) B.V. and Insituform Gulf South, Inc., Plaintiffs/Cross–Appellants,

v.

CAT CONTRACTING, INC., Michigan Sewer Construction, Kanal Sanierung Hans Mueller GmbH & Co KG and Inliner U.S.A., Defendants–Appellants.

Nos. 96–1078, 96–1099.

United States Court of Appeals, Federal Circuit.

Nov. 5, 1996.

Rehearings Denied; Suggestion for Rehearing In Banc Declined Dec. 13, 1996.

Harold James, James & Franklin, New York City, argued, for plaintiffs/cross-appellants.

Edward W. Goldstein, Tobor & Goldstein, L.L.P., Houston, TX, argued, for defendants-appellants. With him on the brief was John T. Polasek.

Before ARCHER, Chief Judge, MICHEL, and SCHALL, Circuit Judges.

MICHEL, Circuit Judge.

Inliner [1] appeals from the district court's order denying its motion for post-verdict judgment notwithstanding the verdict ("JNOV") [2] of invalidity of United States Patent No. 4,336,012 ("the '012 patent"), the district court's order denying its motion to amend certain counterclaims, and the district court's final decision finding infringement under the doctrine of equivalents. Insituform [3] cross-appeals from the district court's order granting Inliner's motion for post-verdict JNOV of no literal infringement of claim 1 of the '012 patent. The case was submitted for decision after oral argument on July 10, 1996. We affirm in all respects, except one: we vacate the finding of infringement under the doctrine of equivalents and remand to redetermine infringement under the doctrine because, although the prosecution history of the '012 patent does not estop Insituform from claiming that the accused processes infringe, the district court's doctrine of equivalents infringement analysis was tainted by the use of an incorrect claim construction.

The appeal and cross-appeal at bar arise from a complex series of trials spanning five years in the U.S. District Court for the Southern District of Texas, Case No. H–90–1690. In February 1990, Insituform brought suit against Inliner, alleging infringement of the '012 patent. Inliner filed an answer, as well as counterclaims for a declaratory judgment of noninfringement, invalidity, and unenforceability of the '012 patent. Inliner also filed a counterclaim for tortious interference with contractual relations which included the assertion that "Insituform has successfully monopolized the market for soft-lining sewer rehabilitation in the United States for many years." The counterclaim did not, however, refer to the federal antitrust laws, nor was there a separate counterclaim alleging antitrust violations.

1. "Inliner" is a collective reference to four separate defendants: Cat Contracting, Inc.; Michigan Sewer Construction Co.; Kanal Sanierung Hans Mueller GmbH & Co. KG; and Inliner U.S.A.

2. A JNOV is now known as a judgment as a matter of law ("JMOL"). As JNOV was the proper terminology used at the time Inliner filed its motion, we will use it throughout this opinion.

3. "Insituform" is a collective reference to three separate plaintiffs: Insituform Technologies, Inc.; Insituform (Netherlands) B.V.; and Insituform Gulf South, Inc.

On March 5, 1991, almost a year after Insituform had filed its answer and counterclaims, the district court filed an order indicating that, *inter alia,* "defendants' counterclaim for antitrust violations is severed."[4] Shortly thereafter, Inliner entered a motion to amend its counterclaims so as "to include specific allegations regarding Insituform's antitrust violations." The district court did not take any immediate action on Inliner's motion.

In June 1991, the patent and state law issues in the case were tried to a jury for two weeks. At the close of the trial, the jury returned verdicts of infringement, no invalidity, no inequitable conduct, and no tortious interference with contract. Although the jury was instructed on both literal infringement and infringement under the doctrine of equivalents, the interrogatory form asked only whether "Inliner made, used, or sold a method that infringes claim one of the '012 patent," *i.e.,* for a general infringement verdict. Inliner moved for JNOV on all issues. By order dated August 28, 1991, the court granted the JNOV motion in part, concluding that Inliner had not literally infringed the '012 patent and that it was entitled to retrial on the question of infringement under the doctrine of equivalents. The court denied Inliner's motion with respect to the jury's verdict of no invalidity, thus leaving that verdict intact.

In February 1995, the claim of infringement under the doctrine of equivalents was retried, this time to the bench, for three days.[5] On October 11, 1995, the district court denied Inliner's motion to amend its allegedly severed counterclaims. In November 1995, the district court entered amended findings of fact and conclusions of law, according to which two of Inliner's processes were found to have infringed under the doctrine. At that time, the court also explained that its earlier reference to the severance of an antitrust counterclaim had been "erroneous[ ]," inasmuch as no such counterclaim had ever existed.

Inliner appeals from the district court's (1) August 28, 1991 order denying its motion for post-verdict JNOV of invalidity of the '012 patent, (2) October 11, 1995 order denying its motion to amend the counterclaims, and (3) final decision finding infringement under the doctrine of equivalents despite Inliner's alleged prosecution history estoppel defense. Insituform cross-appeals from the district court's August 28, 1991 order granting Inliner's motion for post-verdict JNOV of no literal infringement of claim 1 of the '012 patent.

We write solely on the questions of infringement, both literal and by equivalency, of the '012 patent. Of the issues raised by the parties, only these infringement issues merit extended analysis. The jury's rejection of Inliner's attack on the validity of the '012 patent is amply supported by the evidence, and we discern no error in the district court's denial of Inliner's motion for post-verdict JNOV on this point. The district court's eventual denial of Inliner's 1991 motion to amend its "antitrust" counterclaim was not, as Inliner contends, an abuse of discretion, inasmuch as no "antitrust" counterclaim in need of amending ever existed. The district court's decisions on these two points are straightforward, and we affirm them without further discussion. Because the district court's grant of Inliner's motion for post-verdict JNOV of no literal infringement is consistent with the proper construction of claim 1 of the '012 patent, we affirm that grant. Although the district court properly determined that the prosecution history of the '012 patent did not estop Insituform from claiming infringement by the accused processes under the doctrine of equivalents, we vacate the district court's decision that Inliner infringed under the doctrine in light of Judge Gilmore's reliance on a claim construction that is incorrect as a matter of law.

## BACKGROUND

*The Technology*

Underground pipes, such as sewer pipes, are subjected to great stress. As a result,

---

4. Because no such counterclaim existed, the court's order is difficult to comprehend as anything other than a mistake.

5. In 1995, the case was reassigned from Judge Hughes, who had presided over the first trial, to Judge Gilmore, who tried the question of infringement under the doctrine of equivalents.

over time, the pipes develop cracks and other structural defects. Before the development of the technology involved in the case at bar, the only way to rehabilitate a section of underground pipe was to dig up the broken portion and replace it.

Eric Wood, an inventor at Insituform, pioneered a process for rehabilitating a sewer or other underground pipe without digging it up. Specifically, in the process developed by Wood, one inverts within the pipe a flexible tubular liner comprising an impermeable plastic layer and a thick, resin-impregnated felt layer, such that the resin-impregnated felt layer is held against the inner wall of the pipe. The resin used to impregnate the felt is thermosetting; in other words, although soft while at "room" temperature, the resin hardens permanently when exposed to heat. After the tubular liner has been put in place—plastic layer facing in, felt side facing out—and pressed out to conform to the pipe under repair, hot water is pumped through the lining to harden the resin.

Early in the development of this technology, artisans learned that they could facilitate the impregnation process, as well as make the resulting impregnation more thorough, by drawing air from the interior of the felt tube during impregnation. In general, the processes at issue in the case at bar all involve (a) a tube of felt with an impermeable outer layer, (b) into which is placed a "slug" of resin large enough to impregnate fully that length of tubing, (c) after which the tube is drawn through squeezing rollers, (d) while a vacuum is drawn through at least one opening somewhere downstream of the "resin front."

*The Everson Prior Art Patent*

U.S. Patent No. 4,182,262 to Everson ("the Everson patent") issued in January 1980. It teaches both an apparatus and method for impregnating the felt lining of a flexible tube with resin *at the repair site,* thus eliminating the need to transport heavier, already-impregnated tubing to the site. Col. 1, ll. 15–63. The preferred embodiment includes a vacuum pump that is attached, by means of a hose, to the far end of the length of tubing to be impregnated. Col. 6, l. 65—Col. 7, l. 8.

The specification describes the drawing of the vacuum during impregnation as follows:

As the tube passes through the throat [between the conveyor belt and the first roller], it is flattened therein and the resin in the bulge is spread transversely of the frame from side to side within the tube. As the conveyor transports the tube through the apparatus, the tube passes through the flattener commencing at the leading end so that the resin is extruded along the tube toward said opposite end. When the tube is engaged in the throat, the motor driving the vacuum pump is energized, creating a negative pressure in the reservoir, the hose, and the end of the tube opposite the leading end. The impervious outer lamina [of the tube] minimizes intrusion of air into the tube so that an effective vacuum can be maintained. The negative pressure urges the fluid resin to flow within the tube toward said opposite end. The combined action of the flattener and the vacuum system thus cause[s] the resin thoroughly to impregnate the absorbent lamina of the length of the tube required to line the passageway.

Col. 9, ll. 1–19 (diagram reference numbers omitted).

Claim 1 of the Everson patent recites an apparatus corresponding to the preferred embodiment in "means plus function" terms. Claim 2 recites "[t]he apparatus of claim 1 having a source of vacuum connected to the end of the tube opposite said leading end thereof, whereby the fluid material is urged to flow within the tube toward said end thereof opposite to the leading end." Col. 10, ll. 40–44. Claim 3, like claim 1, recites an apparatus, but includes a limitation reciting "vacuum means communicating with the [far] end of [the] tube" to be impregnated. Col. 10, ll. 52–53.

In short, Everson teaches attaching the vacuum to the tube to be impregnated at only *one* place—the end opposite the resin-containing leading end—and applying that vacuum *continuously* throughout the impregnation process.

*The Patent in Suit*

Eric Wood filed the application that matured into the '012 patent in February 1981.[6] The only prior art reference Wood cited was the Everson patent. The application included the following description of an innovative manner of applying a vacuum, or negative pressure, to the tube:

> The vacuum may be applied through a window in the film in the wall of the tube by means of a cup applied to said window and connected to a source of vacuum by means of a flexible hose, whereby the cup can move with the tube during its movement relative to said nip. As each section of the tube has its resin absorbent material thus impregnated with resin, the cup may be moved and applied to a position spaced downstream from the previous window, the said previous window being sealed by means of a patch or the like, whereby the process is repeated for respective lengths of the tube until the entire tube length has been impregnated.

Later, in connection with describing the drawings accompanying the application, Wood offered the following account of applying the vacuum cup to the tube:

> A vacuum source is provided, and a vacuum cup is connected to the vacuum source by means of a flexible hose. The vacuum cup is applied to the outside of the lining tube, downstream of the mass of resin inside the tube ... the vacuum cup being in register with a window made in the outer membrane of the lining tube, so that the vacuum applied to the interior of the cup can be applied to the interior of the lining tube, whereby air is drawn from the inside of the tube to permit the effective and efficient impregnation of the absorbent material with the resin....
>
> Fig. 11 shows the impregnation process at a midway position, and it should be mentioned that when one section of the impregnation of the tube has been completed, the suction cup is removed to a downstream location whereat a further window is formed, the previous window having been sealed by means of a patch of a

material compatible to the material of the coating, the patch being suitably sealingly bonded to the coating material. The vacuum cup is therefore applied at intervals during the impregnation process, until complete impregnation of the resin absorbent material has been achieved.

(Diagram reference numbers omitted).

As initially filed, the Wood application contained nine claims, only four of which are relevant to this appeal. The original four claims with relevance to this dispute are as follows:

1. A method of impregnating a flexible tube comprising an inner layer of resin absorbent material and an outer layer in the form of an impermeable film, wherein the resin absorbent layer is impregnated with a curable resin by applying a vacuum to the inside of a flexible tube whilst the resin is brought into impregnation contact with the resin absorbent material, the impermeable film serving as a means to prevent ingress of air into the interior of the tube, whilst the impregnation process is taking place.

2. A method according to claim 1, wherein the resin is introduced into one end of the tube in a quantity calculated effectively to impregnate all of the resin absorbent material of the tube, and the vacuum is applied to the interior of the tube, downstream of the resin mass, so that the resin will tend to flow towards the vacuum application region.

3. A method according to claim 2, wherein the lining tube containing the mass of resin is fed through a pressure applying nip, such as may be defined by a nip roller, which, together with the movement of the tube, squeezes the resin in a direction towards the region of the application of the vacuum, at the same time flattening the tube and assisting in the even distribution of the resin.

4. A method according to claim 2, wherein the vacuum is applied through a window in the film in the wall of the tube by means of a cup applied to said window and con-

**6.** Insituform (Netherlands) B.V. is the owner of the '012 patent. Insituform Technologies, Inc. is the exclusive licensee and has granted a sublicense to Insituform Gulf South, Inc.

nected to a source of vacuum by means of a flexible hose, whereby the cup can move with the tube during its movement relative to said nip, the cup being moved and applied to a position spaced downstream from the previous window, said previous window being sealed by means of a patch or the like, whereby the process is repeated for respective lengths of the tube until the entire tube length has been impregnated.

The examiner rejected these claims in light of the Everson patent, specifically stating that "[c]laims 1–6 are rejected under 35 USC 103 as unpatentable over Everson et al. The claimed process does not appear to differ in any unobvious aspect from that of the reference." In response, Wood canceled the original claims and submitted three new claims that recited in new form the limitations of original claims 4 through 6. In so doing, Wood submitted the following argument:

The principal reference relied on in the rejection of claims 1 to 6 is the patent to Everson (U.S. 4,182,262). Everson's method is ineffective when dealing with long lengths of tube because that method requires an exceedingly large suction compressor. Applicant's method solves the problem of impregnating long lengths of tubing by forming a window in the tube's impermeable skin, drawing the resin to the region of the window by a vacuum while squeezing the tube to force the resin to flow toward the evacuated region, sealing the window, and repeating the process at another window farther downstream. Thus by iterating and reiterating that process, the resin is drawn along to impregnate the entire length of the tube.

It is submitted that applicant has taught an improvement upon Everson's method which makes feasible the impregnation of long tube lengths and that the grant of a patent on that improvement is merited.

The examiner then allowed the claims without further argument or comment and the '012 patent issued on December 28, 1982. Claim 1, the only claim in suit, is as follows:

1. A method of impregnating with a curable resin an inner layer of resin absorbent material disposed in an elongate flexi-

ble tube having an outer layer formed by an impremeable [sic] film, the method comprising the steps of

(1) introducing into one end of the elongate tube a mass of the curable resin sufficient to impregnate the entire resin absorbent inner layer of the tube,

(2) forming a window in the impermeable outer layer of the tube at a distance from said one end of the tube,

(3) drawing through the window a vacuum in the interior of the tube. downstream of said one end by disposing over the window a cup connected by a flexible hose to a vacuum source which cup prevents ingress of air into the interior of the tube while the tube is being evacuated, the outer layer of the tube being substantially impermeable to air,

(4) beginning at or near the end at which the curable resin mass was introduced, passing the tube between squeezing members which force the resin to flow towards the region of vacuum application as the tube progresses through the squeezing members,

(5) when the resin reaches the vicinity of the region of vacuum application, removing the cup and sealing the window,

(6) providing another window in the impermeable layer of the tube downstream of the previously formed window,

(7) drawing through the new window a vacuum in the interior of the tube while progressively moving the tube through the squeezing members to force the resin to flow toward the new region of vacuum application, and

(8) repeating steps 5, 6, and 7, where necessary to impregnate the entire resin absorbent inner layer of the flexible tube.

Col. 6, l. 37—Col. 7, l. 6.

*The Accused Process*

Inliner engages in two processes which are at issue here. Both processes result in continuous vacuums.

In "Process 1" or "the Multiple Cup Process," from four to six cups are used to draw a vacuum from a corresponding number of

slits in the tube. As a result, when the cup closest to the advancing resin is removed, and the slit beneath it sealed, the remaining downstream cups continue to draw a vacuum in the tube.

In "Process 2" or "the Multiple Needle Process," the multiple cups are replaced by multiple metal tubes. The metal tubes, known as needles, are inserted through the layers of the impregnated tube, rather than merely placed over holes in the wall of the impregnated tube. Inliner did not develop Process 2 until 1991, after the first phase of the case had already been tried to a jury.

## ANALYSIS

*Literal Infringement*

Insituform cross-appeals from the district court's grant of Inliner's motion for JNOV of no literal infringement. According to Insituform, JNOV was improper because *"[e]ach* of defendants' [vacuum] cups 1, 2, 3, etc. is manipulated precisely as called for in the claim, thus constituting multiple infringements."

We review *de novo* the correctness of a grant of a JNOV by reapplying the JNOV standard. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 975, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (in banc), *aff'd,* — U.S. —, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Thus, as the district court was required to do upon Inliner's motion for JNOV, we

> must determine whether there exists evidence of record upon which a jury might properly have returned a verdict in [the non-movant's] favor when *the correct legal standard is applied.* If there is not, [the movant] was entitled to have the question removed from the jury and decided as a matter of law.

*Markman,* 52 F.3d at 975, 34 USPQ2d at 1326 (quoting *Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 756 F.2d 1556, 1560, 225 USPQ 253, 257 (Fed.Cir.1985)). In so determining, we must uphold factual findings made by the jury unless there is a lack of substantial evidence to support a finding in favor of the nonmovant. *Id.* On the other hand, we must consider *de novo* whether the

legal standards applied by the jury are correct as a matter of law. *Id.*

■ Here, we are asked to determine whether there is substantial evidence to support the jury's finding that Inliner literally infringed Insituform's patent. An infringement analysis consists of two steps: interpreting the claims in a patent to determine their scope and meaning and comparing the properly construed claims to the accused product or process. *Id.* at 976, 34 USPQ2d at 1326.

Here, the entire analysis turns on the proper claim construction. That is because the underlying issue of claim construction is whether claim 1 should be construed to be literally limited to a process using one and only one vacuum cup, as asserted by Inliner. If so limited, the claim is also inherently limited to a process where the drawing of the vacuum inside the tube is discontinuous, *i.e.,* interrupted by the moving of the cup from window to window. Such a claim cannot be infringed by Process 1, because that process maintains a continuous vacuum.

■ Claim construction is a question of law which we review *de novo. Id.* at 979, 34 USPQ2d at 1329. In construing claim 1, we look first to the intrinsic evidence of record, namely the language of the claim, the specification and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996). Looking first to the claim language, we note preliminarily that Insituform has conceded that claim 1 contains no terms that have a specialized or technical meaning. Furthermore, nothing in the text of claim 1 suggests the use of more than one cup. Specifically, claim 1 refers to "a cup" and "the cup" repeatedly, suggesting that only one cup is involved. Indeed, rather than describing the process in terms of more than one cup, claim 1 specifically describes using the same cup repeatedly. Also, claim 1 uses the phrase "region of vacuum application" in a manner indicating that only one such region exists at any given time. This use of the phrase "region of vacuum application" is thus inconsistent with the use of more than one cup at any given time, as each cup creates its own

associated region of vacuum application. Likewise, it is also inconsistent with the creation of a continuous, rather than discontinuous, vacuum.

Turning to the text of the specification, we note that neither the specification nor the drawings disclose the use of more than one cup. For example, the specification states:

> The vacuum may be applied through *a window* in the film in the wall of the tube by means of *a cup* applied to said window ... whereby *the cup* can move with the tube.... As each section of the tube has its resin absorbent material thus impregnated with resin, *the cup* may be moved and applied to a position spaced downstream from the previous window....

Col. 2, ll. 30–35 (emphasis added).

> A vacuum source is provided, and *a vacuum cup* is connected to the vacuum source by means of a flexible hose. *The vacuum cup* is applied to the outside of the lining tube downstream of the mass of resin inside the tube....

Col. 5, ll. 61–65 (emphasis added, diagram reference numbers omitted).

> [W]hen one section of the impregnation of the tube has been completed, *the suction cup* is removed to a downstream location.... *The vacuum cup* is therefore applied at intervals during the impregnation process, until complete impregnation of the resin absorbent material has been achieved.

Col. 6, l. 14–24 (emphasis added, diagram reference numbers omitted).

Likewise, the drawings of the '012 patent, specifically figures 10 and 11, show only a single vacuum cup.[7]

■ In light of the language found in the claims, specification and file history, we conclude the only correct and indeed the reasonable interpretation of claim 1 limits the scope of that claim to a process using only one vacuum cup which inherently creates a discontinuous vacuum. Indeed, as Insituform concedes in its brief, "[t]here is no question but that the patent discloses a single vacuum

cup which draws a vacuum at one point and then, when the resin front approaches, is removed from its initial position and repositioned to draw vacuum at its new downstream position." Thus, in light of the fact that Inliner's processes both create a continuous vacuum, neither can literally infringe.

Insituform argues that such an interpretation places too much weight on the distinction between drawing a vacuum and the evacuated state that exists within the tube, even as a cup is moved from one window to another. According to Insituform, "it is not the continuity of *drawing* the vacuum which is important but rather the continuity of *having* an effective vacuum where the resin meets the portion of the felt to be impregnated." However, such attorney argument cannot control in light of the language of the claim. Claim 1, and more specifically steps 3 and 7, is cast in terms of "drawing a vacuum," not merely having a vacuum.

■ Insituform also argues that claim 1 requires only "manipulating the suction cup (or its equivalent) in a particular fashion," that each of the cups used in Process 1 is manipulated in such a fashion, and that "adding something to an infringement [*i.e.,* more than one cup] does not avoid infringement." However, as discussed above, we believe that claim 1 must be construed as reading only on a one cup, discontinuous vacuum process. While adding elements may, in certain instances, fail to prevent a finding of infringement, it will prevent a finding of literal infringement where, as here, the claim is specific as to the number of elements (one cup) and adding elements eliminates an inherent feature (discontinuous vacuum) of the claim.

In light of our conclusion that claim 1 must be construed to literally cover a process using only one cup, and thereby literally cover only a process using a discontinuous vacuum, and the complete lack of evidence indicating Inliner's Process 1 uses only a single cup, there was no evidence upon which the jury could have reasonably returned a verdict in

---

7. Although Insituform's own witnesses confirmed this interpretation of the claim, we need not give such testimony any weight, as the intrinsic evidence alone is sufficient to resolve any ambiguity in the claim. *See Vitronics,* 90 F.3d at 1584, 39 USPQ2d at 1578.

Insituform's favor when applying the correct claim construction, and the district court's grant of JNOV was proper. We therefore affirm the district court's JNOV of no literal infringement.

*Infringement Under the Doctrine of Equivalents*

■ Although we conclude the district court correctly granted JNOV in favor of Inliner on the issue of literal infringement, that does not end our analysis. Infringement may still be established under the doctrine of equivalents if there is "proof of insubstantial differences between the claimed and the accused products or processes." *Hilton Davis Chem. Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512, 1522, 35 USPQ2d 1641, 1648 (Fed.Cir.1995) (in banc), *cert. granted,* —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). This determination is a question of fact and, when made by the trial court, reviewable for clear error. *Hilton Davis,* 62 F.3d at 1521, 35 USPQ2d at 1647.

■ The doctrine of equivalents, however, is subject to the doctrine of prosecution history estoppel, which acts to limit infringement by otherwise equivalent products or processes. *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1218, 36 USPQ2d 1225, 1230 (Fed.Cir.1995). Prosecution history estoppel bars the patentee from recapturing subject matter that was surrendered by the patentee during prosecution in order to promote allowance of the claims. *Mark I Mktg. Corp. v. R.R. Donnelley & Sons,* 66 F.3d 285, 291, 36 USPQ2d 1095, 1099–1100 (Fed.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996); *Pall Corp.,* 66 F.3d at 1211, 36 USPQ2d at 1230. The application of prosecution history estoppel is a question of law subject to *de novo* review. *See Mark I,* 66 F.3d at 291, 36 USPQ2d at 1100.

The district court held that Process 1 and Process 2 did not differ substantially from the process disclosed in the '012 patent. In so holding, the district court rejected Inlin-

er's prosecution history estoppel argument stating,

> There is nothing in the file history of the '012 patent or the prior art which prevents claim 1 from covering Defendants' processes. The patentee originally claimed, in claim 1, all types of vacuum application, and in claim 4 he originally claimed the sequential application of vacuum. The prior art cited by the Examiner did not show that sequential vacuum application, and by amending the claims, the patentee abandoned protection broad enough to include all types of vacuum application but properly retained claims to sequential vacuum application, which is precisely what Defendants do in all of their processes.

Inliner contends that Insituform is precluded by "classical prosecution history estoppel" from asserting that the right to exclude extends broadly enough to cover Inliner's Process 1 or Process 2. According to Inliner,

> During the prosecution of the '012 patent application, Mr. Wood attempted to obtain broad claim coverage covering all vacuum application methods, whether the drawing of a vacuum was continuous or discontinuous.... Mr. Wood abandoned this broad coverage and settled for significantly less, claims limited to a single cup, inherently interrupted drawing of vacuum.... Therefore, Insituform is now estopped to assert a range of equivalents that was disclaimed during prosecution. Specifically, Insituform is estopped from covering a method that continuously draws vacuum from the liner.

We do not agree with Inliner's contentions.

■ In examining the prosecution history in an estoppel analysis, we do not look to the subjective intent of the applicant and what the applicant subjectively believed or intended that he or she was giving up to the public.[8] Rather, the standard for determin-

---

8. This is not to say that we do not examine the purpose of the statements made to the PTO. Thus, for example, "a concession made or position taken to establish patentability in view of prior art on which the examiner has relied, is a substantive position on the technology for which a patent is sought." *Pall Corp.,* 66 F.3d at 1220, 36 USPQ2d at 1231. On the other hand, "when claim changes or arguments are made in order to more particularly point out the applicant's

ing what subject matter was surrendered is objective and depends on what a competitor, reading the prosecution history, would reasonably conclude was given up by the applicant. *Mark I*, 66 F.3d at 291, 36 USPQ2d at 1100; *see also Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1578, 28 USPQ2d 1652, 1656 (Fed.Cir.1993) ("The legal standard for determining what subjective matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent."); *Prodyne Enter., Inc. v. Julie Pomerantz*, 743 F.2d 1581, 1583, 223 USPQ 477, 478 (Fed.Cir.1984) ("Prodyne is *estopped* from now broadening the description of a claim element limited during prosecution so as to encompass a structure which a competitor should reasonably be entitled to believe is not within the legal boundaries of the patent claims in suit.").

■ As noted above, the Insituform application originally contained four claims relevant to the instant dispute. Original claims 1 and 2 were broadly drafted and would likely have read on a process using a single cup or a single needle at any location downstream of the resin, multiple cups or multiple needles at any location downstream of the resin, or continuous vacuum or discontinuous vacuum created at any location downstream of the resin. Claim 3 was also drafted broadly and would have likely read on both continuous vacuum or discontinuous vacuum created at any point along the tube downstream of the resin. Original claim 4 was the narrowest. The claims were rejected over Everson, which discloses both the use of a continuous vacuum and the creation of that vacuum from only a single vacuum source at the far end of the tube opposite the resin source.

In response, Insituform canceled the claims and filed new, narrower claims, including what is now claim 1, which, as we held above, is literally limited to the use of one vacuum cup which inherently creates a discontinuous vacuum. However, in its state-

ment to the PTO, Insituform specifically noted that the problem with Everson was that "Everson's method is ineffective when dealing with long lengths of tube because that method requires an exceedingly large suction compressor." The need for an exceedingly large suction compressor occurred because the Everson suction compressor was located at the far end of the tubing. Insituform solved this problem by placing the suction source closer to the resin front, thus allowing the use of a smaller suction compressor. Thus, Insituform unequivocally gave up coverage to a process in which a single vacuum source is located at the far end of the tube.

It is true that, in explaining its amendments, Insituform discussed the use of a single vacuum source which was to be moved along the tube as the resin front advanced. This suggests that Insituform envisioned the use of a discontinuous vacuum created sequentially by only one vacuum source. However, this statement alone is too equivocal to be read as a statement which would estop Insituform from equivalently covering a number of small compressors spread along the tube creating a continuous vacuum. The prosecution history makes clear that the problem to be solved was the need for a large compressor when the vacuum was created a significant distance from the resin source. The use of one vacuum source repeatedly moved down the tube as the resin advances and the use of a number of vacuum sources spread along the tube so that one is always near the advancing resin both solve the problem presented by Everson by placing the vacuum source close to the resin, thereby allowing the use of a smaller vacuum source.

Although a patentee's "unmistakable assertions" to the PTO in support of patentability will estop the patentee from obtaining coverage over surrendered material, *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1582, 37 USPQ2d 1365, 1373 (Fed. Cir.1996) (citing *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389, 222 USPQ 929, 933 (Fed. Cir.1984)), here, however, it cannot be said

invention [*e.g.*, in response to a rejection under 35 U.S.C. § 112], the purpose is to impart preci-

sion, not to overcome prior art." *Id.*

that a reasonable competitor could conclude that Insituform relinquished coverage of processes using either multiple vacuum sources or a continuous vacuum. At no point did Insituform indicate that the Everson problem could be solved only in the manner used by Insituform, *i.e.*, Insituform never stated that the problem could not be solved by using more than one vacuum source or a continuous vacuum. Rather, the only express limitation put on the invention by Insituform was the use of a vacuum source close to the resin. Thus, in light of the equivocal nature of Insituform's statements, no reasonable competitor could conclude that Insituform gave up coverage of continuous vacuum created by one or more vacuum sources. We therefore conclude that the prosecution history does not estop Insituform from asserting that the right to exclude extends broadly enough to cover either Process 1 or Process 2.

We cannot, however, uphold the district court's finding of infringement under the doctrine of equivalents because it is based on an incorrect claim construction. Although Judge Hughes used the correct claim construction in concluding that Inliner had not literally infringed, Judge Gilmore appears to have applied a different and incorrect claim construction in concluding that there was no infringement under the doctrine. Specifically, in reaching her decision regarding this issue, Judge Gilmore noted that: (1) "[n]owhere in the claim is the licensee restricted to the use of one cup"; (2) the claim was silent regarding "whether the vacuum in the liner is continuous or not"; and (3) the vacuum in the patented invention is continuous. Thus, as the district court's doctrine of equivalents analysis was distorted by its incorrect claim construction, we must remand for new findings regarding this issue in accordance with the correct claim construction, *e.g.*, whether the use of many cups is equivalent to the use of one cup, whether a needle is equivalent to a cup, and whether the use of a discontinuous vacuum is equivalent to the use of a continuous vacuum.

We note also that, on remand, the district court should strive to avoid the conceptual misunderstanding perhaps present in some of our case law. Namely, it is incorrect to refer to a claim as being expanded or enlarged when infringement is found under the doctrine of equivalents. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684, 14 USPQ2d 1942, 1948 (Fed. Cir.1990) ("To say that the doctrine of equivalents extends or enlarges *the claims* is a contradiction in terms. The claims—i.e., the scope of patent protection *as defined by* the claims—remain the same and application of the doctrine *expands the right to exclude* to "equivalents" of what is claimed.") (emphasis in original).

*AFFIRMED–IN–PART, VACATED–IN–PART AND REMANDED.*

### COSTS

Each party to bear its own costs.