**Jon E. KINZENBAW and Kinze Manufacturing, Inc., Appellees,**

**v.**

**DEERE & COMPANY and Eugene G. Keeton, Appellants.**

**Appeal Nos. 83–1424, 84–523.**

United States Court of Appeals, Federal Circuit.

Aug. 7, 1984.

Dugald S. McDougall, Chicago, Ill., argued for appellants. With him on the brief were Theodore R. Scott and Keith V. Rockey, Chicago, Ill., and Donald G. Ribble, Cedar Rapids, Iowa, of counsel.

James J. Hill, Chicago, Ill., argued for appellee. With him on the brief were Duane Burton, Denver, Colo., and Paul J. Petit, Chicago, Ill., of counsel.

Before MARKEY, Chief Judge, and FRIEDMAN, RICH, DAVIS and BALDWIN, Circuit Judges.

FRIEDMAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Northern District of Iowa after a jury trial in a patent infringement case. The jury, in response to special interrogatories, found that each of the five patents in issue was either invalid, unenforceable, or not infringed. The trial court entered judgment on that verdict. We affirm most of the judgment, but vacate one portion of it as moot.

## I

Appellant Deere & Company (Deere) owns four of the patents involved: U.S. Patent No. 3,552,601 to Hansen (Hansen patent); U.S. Patent No. 3,499,495 to Pust (Pust patent); U.S. Patent No. 4,009,668 to Brass and Hansen (Brass-Hansen patent); and U.S. Patent No. 3,982,670 to Brass (Brass patent). Appellant Keeton owns the remaining patent, U.S. Reissue Patent No. 27,578 (Keeton patent) and Deere holds an exclusive license under it from Keeton.

All five patents cover elements of a row planter, an agricultural machine that, when pulled by a tractor, opens a furrow in the soil, places seeds at appropriate intervals in the furrow, and loosely covers the seeds with moist earth. In order to help farmers optimize their yield, row planters have become rather complex machines.

The planters must produce a furrow that consistently maintains the proper depth for planting the seed. If the machine plants the seeds too deeply, the young plant will require more time to push its way above the surface and thus will not mature as rapidly. A seed planted too shallowly may be surrounded by the drier earth near the surface and thus take more time to germinate, again resulting in delayed maturity. The machine must also eject only one seed at each interval. If the machine ejects two seeds, two plants may grow too close together and compete with one another for light, water, and nutrients. If the machine does not eject a seed at a given point, the farmer's yield is reduced because no plant grows where the soil could have supported one.

Finally, the machine must cover the seed with moist, loosely packed earth. If the soil above the seed is packed too tightly, it may slow the young plant's ability to break through the surface. If the machine packs dry earth around the seed, the seed will not germinate as quickly.

Each of the patents involved in this suit deals with a way to minimize at least one of the problems described above. The Keeton patent covers an apparatus for selecting one seed from among a group of seeds.

The Hansen patent describes various improvements upon the Keeton device. The Pust patent covers an apparatus for preventing dirt from falling into the furrow once it is cut, thus maintaining constant width and depth in the furrow. The Brass-Hansen patent describes an improvement upon the Pust invention. The Brass patent describes a means for driving the seed ejector.

A row unit, described above, plants a single row of seeds in a field. Farmers generally prefer to haul more than one row unit behind their tractors. In this way they can plant twelve or more rows at one pass. In order to attach more than one row unit to the tractor, however, farmers must use a "tool bar," which attaches to the tractor like a trailer. Many row units can then be attached to the tool bar at suitable intervals.

Appellee Kinze Manufacturing, Inc. (Kinze) produced and sold a rear-folding tool bar. In order also to sell a complete planter to farmers, Kinze bought row units from Deere and sold them attached to its tool bar. Kinze encountered some difficulty, however, in obtaining enough Deere row units, apparently because Deere preferred to sell the units attached to its own tool bar.

Kinze sued Deere in 1977, alleging that Deere's selling of its patented row unit together with its unpatented tool bar constituted an illegal tying arrangement. In settlement of that suit, Deere agreed to provide Kinze with row units that it could sell in conjunction with its tool bars.

Despite this agreement, Kinze still could not obtain enough Deere row units. When Kinze's attorneys advised that Deere's patents were invalid, Kinze began producing a row unit similar to Deere's.

Kinze then instituted the present suit against Deere. Kinze again alleged that Deere's sale of its patented row planter in combination with its unpatented tool bar was an illegal tying arrangement in violation of the antitrust laws. Kinze also charged Deere with a breach of the 1977

settlement agreement. The complaint also sought a declaratory judgment that the Pust and Brass-Hansen patents were invalid and not infringed.

Deere filed a counterclaim alleging that Kinze had infringed each of the five patents listed above and also had engaged in unfair competition. It sought injunctive relief and damages. The patent issues were separated from the other issues in the case for trial.

The court submitted to the jury 13 special interrogatories broken down into a total of 35 subparts. Each subpart asked the jury to decide one of the issues regarding one of the patents involved in the case. For example, interrogatory 4 asked:

> Was the subject matter of the claims of the following patents publicly known or used by others in this country before the claimed invention was made by the patentee? ("Yes" is a vote for Kinze, "No" for Deere).

| Patent | Your Answers | |
| --- | --- | --- |
| Hansen '601 | YES____ | NO____ |
| Brass-Hansen '668 | YES____ | NO____ |

The jury decided 18 of the questions in Deere's favor and 17 in Kinze's favor. The jury found for Kinze on at least two grounds concerning each patent. Thus, each of Deere's patents was found to be either invalid, unenforceable, or not infringed. The court entered judgment in accordance with the jury's answers to the interrogatories. The judgment held that the Keeton, Hansen, Brass-Hansen, and Brass patents are invalid and that the Pust and Brass-Hansen patents are unenforceable, and dismissed Deere's counterclaim "on the merits."

Deere filed a motion for judgment notwithstanding the verdict (n.o.v.) on the ground that the jury's determinations were not supported by clear and convincing evidence. The district court denied the motion. It stated:

> Judgment N.O.V. is proper only if reasonable persons, viewing the evidence in the light most favorable to sustaining the jury's verdict and giving the prevailing party the benefit of all reasonable inferences, could not differ as to the conclusion reached.
>
> Here, a review of the record discloses that each factual question was genuinely contested in the record and hence, properly submitted to the jury for their consideration. It is for the jury, not the court, to resolve questions about conflicting evidence and questions as to the weight and credibility of witnesses. Although the jury might have found to the contrary, on any issue which it considered, it was not required to do so by the law. Moreover, as this court has previously indicated, each of the jury's findings were [sic] supported by the evidence.

*Kinzenbaw v. Deere & Co.*, No. C 80–20, slip op. at 2–3 (N.D.Iowa Aug. 24, 1983) (citations omitted).

## II

Before this court, Deere makes a sweeping attack upon the jury's determinations. It tells us that "not a single one of the jury findings that Deere is challenging on this appeal had substantial evidentiary support." This charge seems somewhat implausible in view of the fact that the jury decided 18 of the questions in favor of Deere and only 17 in favor of Kinze. The verdict did not indicate that the jury took a one-sided view of the evidence. In any case, the record does not support this allegation.

As noted, the jury decided against Deere on at least two grounds on each of the five patents at issue. Deere challenges each of the jury's determinations on each of the patents adverse to it. We find it unnecessary to decide all of these issues, however, since (except for the Keeton patent, any issues with respect to which are now moot) there is at least one ground upon which the adverse determination with respect to each of the patents may be upheld.

### A. *The Keeton Patent.*

The Keeton patent expired on March 14, 1984. Deere therefore can no longer obtain injunctive relief with respect to it.

Deere admits in its reply brief that its "claim for damages arising from Kinze's infringement of the Keeton patent was released by the Settlement Agreement dated April 1, 1983." Accordingly, as Deere recognizes, any issue concerning the validity of the Keeton patent is moot.

We therefore vacate the portion of the judgment relating to the validity of the Keeton patent and remand this portion of the case to the district court for dismissal of the portion of the counterclaim relating to that patent. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); *Gibraltar Industries, Inc. v. United States*, 726 F.2d 747 (Fed.Cir. 1984).

### B. *The Hansen and Brass-Hansen Patents.*

During the trial, Kinze introduced some evidence that both the Hansen and Brass-Hansen inventions were "known or used by others in this country . . . before the invention . . . by the applicant." 35 U.S.C. § 102(a) (1982). In a motion for a directed verdict, Deere raised a number of specific issues it urged the court not to submit to the jury. It also included a general request for a directed verdict on Kinze's invalidity defenses, including the claim of obviousness based upon prior art not cited to the examiner. Deere, however, did not specifically refer in that motion to the prior public knowledge or use issue.

The jury answered affirmatively interrogatory 4, which asked whether the subject matter of the Hansen and Brass-Hansen patents was "publicly known or used by others in this country before the claimed invention was made by the patentee?" In its motion for judgment n.o.v., Deere contended that there was not sufficient evidence to support that jury determination. It makes the same argument here.

■ Rule 50(a) of the Federal Rules of Civil Procedure requires that "[a] motion for a directed verdict shall state the specific grounds therefor." If a party fails to specify an issue in its motion for a directed verdict, it may not subsequently challenge the jury's verdict on that issue, which is

conclusive on that point. *U.S. Industries, Inc. v. Blake Construction Co.*, 671 F.2d 539, 548 (D.C.Cir.1982). A specific reference to the issue in a motion for judgment n.o.v. does not cure a prior failure to include the issue in the motion for a directed verdict and, thus, does not preserve the issue for appeal. *See* 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2537 (1971).

Deere contends that it could not have raised the prior public knowledge or use issue in its motion for a directed verdict because Kinze had not raised the issue until after the motion had been filed. The record does not support this contention.

On March 18, 1983, counsel for both parties met with the judge to discuss proposed jury instructions. Counsel for Deere specifically objected to proposed instruction 12, which stated (among other things) that the claimed invention "must not have been publicly known or used by others in this country before the claimed invention was made by the patentee," because "there is no evidence in the case and no contention, so far as I know, that the invention of any patent in suit was known or used by others in this country before the claimed invention was made by the patentee." Kinze's counsel disagreed, stating that "exactly what we are contending [is] that it was known or used by others in this country. . . ." The court noted the objection but did not rule upon it.

■ Thus, Deere was on notice as of March 18, 1983, (1) that Kinze contended that the issue of prior public knowledge or use was in the case, and (2) that the court might allow the jury to consider the issue.

On March 22, 1983, Kinze rested. The following morning Deere presented its oral motion for a directed verdict. Although the court had not yet ruled on Deere's objection to the jury instruction that included the prior public knowledge or use issue, Deere did not refer to that issue in its motion, although it specifically referred to a number of other issues. Deere's refer-

ence in the motion to prior art generally did not specifically raise this issue.

The court denied the motion for a directed verdict. Later that day it rejected Deere's objection to instruction 12. It ultimately submitted the issue of prior public knowledge or use to the jury.

In these circumstances, we hold that Deere waived its right to challenge on appeal the court's denial of its motion for judgment n.o.v. on the issue of prior public knowledge or use. Despite notice that that issue was in the case, Deere failed to preserve the point in its motion for a directed verdict, as rule 50(a) requires.

### C. The Pust Patent.

Planters cut a furrow in the soil with two round blades called discs. The depth of the furrow is controlled by two gauge wheels which are connected to the discs, rest upon the ground, and are located on the outside of the planter. By raising or lowering the gauge wheels in relation to the discs, the farmer is able, within limits, to determine the depth of the furrow. All of these aspects of the planter were shown by the prior art.

There were two recurrent problems that Pust addressed in his invention. If soil clings to the discs, the furrow is of an uneven width and soil often caves in at the edges of the cut. Soil thrown from the discs also falls into the furrow. Both conditions result in an uneven depth of the furrow.

Pust sought to avoid these problems by moving the gauge wheels slightly behind the discs and immediately adjacent to them. This made the gauge wheels touch the discs where they leave the soil, thereby scraping off any soil stuck to the discs at that point. Placing the gauge wheels directly next to the discs also compressed the soil that constitutes the furrow walls, thus minimizing the amount of soil from the wall that can fall into the furrow. The discs, when freed from clinging soil, cut a more even furrow.

Originally Pust did not claim any specific relationship between the radius of the discs and the radius of the gauge wheels. Claim 8 (now claim 1), the only independent claim (after amendment) now in issue, then covered:

> An apparatus for forming seed planting furrows comprising:
>
> a pair of furrow forming discs,
>
> means rotably supporting said discs on intersecting axes with the peripheries of said discs substantially contacting at their point of entry into the ground and diverging apart rearwardly and upwardly relative to the direction of travel,
>
> a pair of depth gage compacting wheels in face contact with the outer surfaces of said discs,
>
> means supporting said wheels on axes parallel to, and spaced rearwardly from, the axes of said discs,
>
> said wheels extending beyond the peripheries of the discs which they contract rearwardly of the axes of said wheels relative to the direction of travel.

The examiner found claim 8 and dependent claim 9 "unpatentable over Rasmussen in vew [sic] of Siems." The Rasmussen patent discloses a disc-type planter in which the gauge wheels are mounted adjacent to the discs such that the relative positions of the axes of the discs and the gauge wheels may be adjusted, thereby adjusting the depth of the furrow. The examiner explained this ruling by pointing out that "it would have been obvious to adjust the proportions of the blade and the wheel such that the wheel extends beyond the disc."

In order to overcome this rejection, the patentee narrowed the claims by specifying the radius of the gauge wheels involved. After an interview with the examiner, Pust amended claim 8 to cover only devices wherein "the radius of the wheels exceed[s] the distance from the axis [sic] of the wheels to the rear edges of the discs and [is] less than the radius of the discs." This limitation satisfied the examiner, who issued the patent with the narrowed claims.

In its answer to interrogatory 13, the jury found that, in the accused Kinze device, the radius of the gauge wheel exceed-

ed the radius of the disc. The record supports this determination. Thus, the district court justifiably concluded that Kinze's apparatus does not literally infringe the Pust patent, which claims only wheels with a radius less than that of the discs.

Deere, however, contends that it established infringement under the doctrine of equivalents because the accused Kinze planter "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950). Some evidence supports Deere's contention that the size of the gauge wheel is irrelevant and that the larger gauge wheel is equivalent to the smaller gauge wheel.

The district court, however, applied the doctrine of prosecution history estoppel to preclude Deere from relying upon the doctrine of equivalents. Finding that Pust had intentionally narrowed his claims in order to avoid the examiner's rejection and obtain the patent, the court refused to permit Deere to avoid that limitation upon the claims through the doctrine of equivalents. The court, therefore, held that the accused Kinze device did not infringe the Pust patent.

Deere attempts to avoid the doctrine of prosecution history estoppel on the ground that Pust's limitation of his claims to devices in which the gauge wheels had a smaller radius than the discs was unnecessary to distinguish the prior art. *Cf. Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 219 USPQ 473 (Fed.Cir.1983). Deere points out that the Rasmussen device, the prior art over which the examiner found Pust unpatentable, also contained a gauge wheel with a smaller radius than that of the discs. Thus, Deere contends, only that portion of the limitation that provided that the radius of the gauge wheels must exceed the distance from the axes of the wheels to the rear edges of the discs was necessary to render the claims patentable over Rasmussen.

We decline to undertake the speculative inquiry whether, if Pust had made only that narrowing limitation in his claim, the examiner nevertheless would have allowed it. The file on Pust's patent, to which the public had access, explicitly showed that in response to the examiner's rejection, Pust had narrowed his claims to a planter in which "the radius of the wheel ... [is] less than the radius of the disc." Deere offers no convincing reason why a competing manufacturer was not justified in assuming that if he built a planter in which the radius of the wheels was greater than that of the disc, he would not infringe the Pust patent.

■ The doctrine of equivalents is designed to protect inventors from unscrupulous copyists, *Graver Tank*, 340 U.S. at 607, 70 S.Ct. at 855, 85 USPQ at 330, and unanticipated equivalents. *See Hughes Aircraft*, 717 F.2d at 1362, 219 USPQ at 481 ("An applicant for patent ... is not required to predict all future developments which enable the practice of his invention in substantially the same way."). The present case, in which Kinze utilized a characteristic that the inventor specifically eliminated from his claim, is a far cry from either of those situations. Kinze did not endeavor to avoid the Pust patent by making minor immaterial changes in what Pust had invented. Instead, Kinze adopted the very element that Pust had eliminated for the stated purpose of avoiding the examiner's rejection and obtaining the patent.

Deere has not given any convincing reason why we should enlarge the literal scope of the Pust patent claims. Such enlargement would be particularly inappropriate here, where we deal with "improvement patents in a crowded art." *Hughes Aircraft*, 717 F.2d at 1362, 219 USPQ at 481.

### D. *The Brass Patent.*

The Brass patent covers various elements embodied in Deere's row unit. In 1972, after the invention was embodied in a prototype planter, Deere tested the planter for 1400 hours on its private lots in Illinois and Texas.

Beginning with the 1973 planting season, Deere sought to test the warrantability, durability, and acceptability of the planter. Deere's Sales Branch, acting through local independent dealers, made planters available to farmers (called "customers" in Deere's internal memoranda) to use in planting crops. Deere instructed the dealers to keep the units moving: "If one customer is not going to be using it for a few days and another customer could, please move it."

In 1973, the farmers used the planters for 1,000 hours in five states, and in 1974, for 500 hours in 11 states. By the end of 1974, 40,000 acres had been planted with the machines.

On July 30, 1975, three years after Deere began using the invention, Deere filed the application for the Brass patent.

One of the grounds upon which Kinze challenged the Brass patent was that the farmers' testing of the planter constituted a public use of the claimed invention more than one year prior to the filing of the application. *See* 35 U.S.C. § 102(b) (1982). The jury determined that the invention had been thus "in public use" and the court held the patent invalid upon this ground.

The jury instructions treated the question of public use as a two step analysis. *But see TP Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 220 USPQ 577 (Fed.Cir.1984). First, the court instructed the jury that "any no-secret [sic] use of a completed and operative invention in its natural and intended way is a 'public use.'" Second, the court charged that

[a]n exception to the public use provision is made were [sic] the use is one which is substantially for purposes of experimentation. However, if you find that the type of experimentation being done was primarily for commercializing the apparatus or process or toward gaining a competitive advantage or realizing a commercial gain, then such work, if it took place more than one year before the filing of applications on such alleged inventions, makes invalid any patent issuing on such applications.

Under these instructions, to which Deere did not take any exception relevant here, in order to have concluded that the invention was in public use more than a year before the application date, the jury must have found that the use of the invention was both (1) not secret and (2) principally directed toward commercializing the invention.

At oral argument Deere's counsel explicitly eschewed any contention that the farmers' testing of the machines was not a public use because it was experimental, but "rel[ied]" solely on the claim that the farmers' use was not public because it was secret. Kinze denies that the use was secret. We find it unnecessary to resolve that question since, even if the use was secret, its commercial character made it a public use.

■ A commercial use is a public use even if it is kept secret. *Metallizing Engineering Co. v. Kenyon Bearing and Auto Parts Co.*, 153 F.2d 516, 68 USPQ 54 (2d Cir.1946) (per L. Hand, J.); *see D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 219 USPQ 13 (Fed.Cir.1983) (citing *Metallizing*); 2 D. Chisum, *Patents* § 6.02[5], at 6–36 (1983) ("it is now well established that commercial exploitation by the inventor of a machine or process constitutes a public use even though the machine or process is held secret." (footnote omitted)). While secrecy is one factor to be considered in determining whether the use was experimental or public, *see TP Laboratories*, 724 F.2d at 971–72, 220 USPQ at 582, secrecy alone does not necessarily negate public use. *Id.* at 972, 220 USPQ at 583; *Metallizing*, 153 F.2d at 520, 68 USPQ at 58.

In *W.L. Gore & Associates v. Garlock, Inc.*, 721 F.2d 1540, 220 USPQ 303 (Fed.Cir. 1983), this court held that in the particular circumstances there involved, the secret use by third persons of a patented process to produce tape that those persons sold commercially, did not constitute a public use of the process which, under section 102(b), would bar a patent on the process. The court stated, however, that if those

third persons "commercialized the tape, that could result in a forfeiture of a patent granted them for their process on an application filed by them more than a year later." 721 F.2d at 1550, 220 USPQ at 310 (citing *Auld* and *Metallizing* ).

"[A] decision on whether there has been a public use can only be made upon consideration of the entire surrounding circumstances." *TP Laboratories*, 724 F.2d at 972, 220 USPQ at 582. Considering all the circumstances in this case, we cannot say that the jury improperly determined that the Deere's testing of the machines constituted a public use even if that testing were secret.

■ In using the machines to test them for Deere, the farmers served Deere's commercial purposes. Deere has disavowed any claim that such use was experimental. Deere used the farmers as its agents, and the testing of the machines was a commercial use by Deere of its patented invention. Since that commercial use occurred more than a year before the filing of the application for the Brass patent, section 102(b) barred the issuance of that patent.

## CONCLUSION

The judgment of the United States District Court for the Northern District of Iowa is vacated insofar as it invalidated the Keeton patent, and the case is remanded to that court to dismiss as moot the portion of the counterclaim relating to that patent. In all other respects the judgment of the district court is affirmed.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.