**ACLARA BIOSCIENCES, INC., Plaintiff,**

**v.**

**CALIPER TECHNOLOGIES CORP., Defendant.**

Nos. C 99–1968 CRB, C 00–0145 CRB.

United States District Court, N.D. California.

Dec. 11, 2000.

Stephen P. Freccero, Harold J. McElhinny, Matthew Kregger, Jason Crotty, Morrison & Foerster, LLP, San Francisco, CA, for plaintiff.

Paul J. Berman, Glen S. Weinstein, Adriana S. Luedke, Susan Koegel, Camilla M. Jackson, Christopher J. Prokop, William S. Livingston, Jr., Covington & Burling, Washington, DC, Allen Ruby, Ruby &

Schofield, San Jose, CA, Richard C. Darwin, Sonya D. Winner, Linda C. Goldstein, Covington & Burling, San Francisco, CA, for defendant.

## ORDER DENYING SUMMARY JUDGMENT

BREYER, District Judge.

Now before the Court is the defendant's motion for summary judgment in light of the Federal Circuit's opinion in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558 (Fed.Cir.2000) (en banc). Having carefully considered the parties' papers and with the benefit of oral argument on December 7, 2000, the defendant's motion is hereby DENIED.

## BACKGROUND

The plaintiff ACLARA BioSciences, Inc. ("ACLARA") brought the present suit for infringement of U.S.Patent No. 5,750,015 ("the '015 patent") against the defendant Caliper Technologies Corp. ("Caliper"). The Court has described the technology claimed by the '015 patent in some detail in previous orders, *see, e.g.*, Claim Construction Order ("Markman Order"), July 17, 2000; Order Regarding Summary Judgment ("Summary Judgment Order"), Oct. 27, 2000, and will only review the invention here briefly to the extent necessary to decide the present motion.

As a result of this Court's earlier orders, ACLARA is now asserting only Claim 1 of the '015 patent. That claim reads as follows:

A device for moving charged particles through a medium employing an electric field, said device comprising:

an electrically non-conductive solid support having an upper surface;

a main trench in said solid support extending downward from said upper surface;

a plurality of branch trenches connected to said main trench for moving charged particles into and out of said main trench; and

a plurality of electrodes positioned to be in electrical contact with a medium when present in said trenches.

In its Markman Order and its Summary Judgment Order, the Court interpreted the phrase "a plurality of electrodes positioned to be in electrical contact with a medium when present in said trenches" to require the placement of electrodes along the medium at intermediate points, and not just at either end of the trench. *See* Summary Judgment Order at 10 (citing the Markman Order). In the Court's view, such a configuration was consistent with the '015 patent's specification, which indicated that the location of the electrodes was designed to create moving waves achieved by the application of between five and over one thousand electric fields along the length of the trench. *See id.*

As a result, the Court determined that Caliper's devices could not literally infringe the '015 patent as a matter of law since no reasonable jury could conclude that the claim read on Caliper's products. *See id.* at 11.[1] The only way that ACLARA can establish infringement of its patent, therefore, is if it can show that Caliper's devices infringe the "plurality of electrodes" limitation[2] under the doctrine of equivalents.

---

1. The Court also granted summary judgment of non-infringement as to literal infringement of the trench limitation. *See id.* at 7–9. Because the trench limitation was not amended during the course of patent prosecution, however, ACLARA can still show infringement of that limitation under the doctrine of equivalents after *Festo*. *See* Section I.D *infra* (discussing *Festo*). The present motion for summary judgment is thus limited to the "plurality of electrodes" limitation.

2. The parties (and this Court) have occasionally referred to the various clauses in Claim 1 as "elements" of the claimed invention. However, as the Federal Circuit clarified in *Festo*, it is "preferable to use the term 'limitation' when referring to claim language and the term 'element' when referring to the accused device." *Festo*, 234 F.3d at 563 n. 1.

During the course of prosecuting the '015 patent, ACLARA[3] amended the "plurality of electrodes" phrase for a purpose related to patentability. Claim 1 originally read: "a plurality of electrodes positioned to be operatively connected to said trenches for moving said charged particles in said trenches." Caliper Brief, Dec. 4, 2000, at 2; *see id.,* Ex. A, at PTO 353 (containing the original application). The U.S.Patent and Trademark Office ("PTO") examiner rejected the claim on the grounds that it was either anticipated or obvious in light of a 1983 patent issued to Batchelder ("the Batchelder reference"). *See id.,* Ex. B, at PTO 366 (containing the PTO's rejection).

ACLARA distinguished the Batchelder reference in two ways. First, it argued that the Batchelder reference was limited to dielectrophoresis, or the movement of neutral particles, whereas ACLARA's application was directed to the movement of charged particles, thereby necessarily excluding dielectrophoresis. Second, ACLARA observed that the Batchelder reference taught insulating the electrodes from the medium rather than placing the electrodes in direct electrical contact with the medium. *See id.,* Ex. C, at PTO 383–85.

ACLARA accordingly narrowed the "plurality of electrodes" clause to indicate that the electrodes should not be insulated from the medium but should instead be in direct electrical contact. Thus, comparing the original version of the "plurality of electrodes" phrase with the present version, the amendment read (with common language in normal text, old language in brackets, and new language underlined): "a plurality of electrodes positioned to be [operatively connected to] *in electrical contact with a medium when present in* said trenches [for moving said charged particles in said trenches]." *Id.,* Ex. C, at PTO 371. The effect of that amendment

after *Festo* is the central issue in this summary judgment motion.

## DISCUSSION

At a claim construction hearing in a related case between the parties on November 30, 2000, counsel for Caliper notified the Court that it intended to move for summary judgment in the present dispute in light of the Federal Circuit's recent (then one day old) opinion in *Festo.* Facing a start date for the infringement trial of December 6, 2000, the Court decided to postpone the trial to entertain Caliper's *Festo* motion.

In *Festo,* the Federal Circuit significantly limited the scope of the doctrine of equivalents when a patentee has amended his claims for a reason related to patentability. If—as Caliper argues—*Festo* has eliminated ACLARA's ability to show infringement under the doctrine of equivalents as to the "plurality of electrodes" clause due to claim amendments during prosecution of the '015 patent, ACLARA cannot show infringement at all and Caliper is entitled to summary judgment, making a trial unnecessary. ACLARA counters that *Festo* is inapplicable since ACLARA's amendment was related to the use of insulation and did not affect the configuration of electrodes under Claim 1.

## I. THE FEDERAL CIRCUIT'S RULING IN *FESTO*

In *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), the U.S. Supreme Court held that prosecution history estoppel applies to a claim amendment when the amendment was made for "a substantial reason related to patentability." *Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040. In light of that decision, the Federal Circuit asked the parties in *Festo* to brief five "en banc questions" clarifying the extent to which a claim

---

3. ACLARA was the assignee of the patent; the inventors were Drs. David and Zoya Soane. Technically, the Soanes and/or their patent counsel executed the amendments to the patent claims, but for the sake of simplicity, the Court will simply refer to ACLARA.

amendment might create prosecution history estoppel and thereby bar application of the doctrine of equivalents. *See Festo,* 234 F.3d at 563.

## A. Prior Federal Circuit Prosecution History Estoppel Jurisprudence

 To appreciate the significance of *Festo,* it is valuable first to briefly summarize the status of prosecution history estoppel before *Warner–Jenkinson* and *Festo.* The doctrine of equivalents enables a patentee to show infringement even if her claims do not literally read on an accused device by showing that the differences between the claimed invention and the accused product are insubstantial. *See id.* at 563–64. Prosecution history estoppel limits the doctrine of equivalents by preventing a patentee from claiming as equivalent subject matter which she surrendered in the course of prosecuting her patent. *See id.*

One of the central questions for courts applying prosecution history estoppel prior to *Festo* was the range of equivalents that was available when the applicant had amended her claims during prosecution. *See id.* at 570 (noting that "the question of the scope of equivalents available when prosecution history estoppel applies to a claim element has not been directly addressed or answered by the Supreme Court"). When an applicant does not amend her claim at all during prosecution, prosecution history estoppel does not apply and the applicant is entitled to assert under her patent both the literal scope of and the full range of equivalents to her claims. On the other hand, when prosecution history estoppel did apply because the applicant had amended her claims for a reason related to patentability, then the court had to decide the range of equivalents that the applicant could assert in an infringement suit in spite of the prosecution history. *See id.* at 571–72.[4]

Prior to the creation of the Federal Circuit, some regional circuits had followed a "flexible bar" approach to prosecution history estoppel, holding that the range of equivalents available to a patentee depended on a variety of factors. Other circuits had employed a "complete bar" approach in which the patentee was entitled to no range of equivalents at all; in other words, the patentee could only assert literal infringement if she had amended her claims in the course of prosecution. *See id.* In *Hughes Aircraft Co. v. United States,* 717 F.2d 1351 (Fed.Cir.1983), the Federal Circuit adopted the flexible bar approach and held that prosecution history estoppel could have a limiting effect on the doctrine of equivalents "within a spectrum ranging from great to small to zero." *Hughes,* 717 F.2d at 1363.

Less than one year after *Hughes,* however, the Federal Circuit decided *Kinzenbaw v. Deere & Co.,* 741 F.2d 383 (Fed.Cir. 1984). There the Federal Circuit rejected a patentee's attempt to assert equivalence in spite of the prosecution history, thereby adopting a rule closer to the complete bar approach. *See Festo,* 234 F.3d at 571–74 (discussing *Kinzenbaw*). The Federal Circuit did not overrule *Hughes* in *Kinzenbaw,* and later cases "neither repudiated *Kinzenbaw* nor reconciled the inconsistency" between the *Hughes* and *Kinzenbaw* lines of authority. *Id.* at 574–75. Those subsequent decisions "continued to visit the question of the range of equivalents that is available after prosecution history estoppel has been determined to exist," and while they ostensibly continued to follow the flexible bar approach in *Hughes,* they did not produce a definitive answer regarding the range of equivalents available after a claim was amended. *Id.* at 573–74.

The incompatibility of *Hughes* and *Kinzenbaw* was not lost on observers of patent law, who characterized the decisions as "two lines of authority" that had given rise to "ever-increasing 'uncertainty and confu-

4. The Court uses inconsistent tenses in this description because the former sentence is still the rule after *Festo,* while the latter sentence is no longer good law.

sion' in patent litigation." *Id.* (quoting 5A Donald S. Chisum, *Chisum on Patents* § 18.05[3][b], at 18–492 (1998), and Douglas A. Strawbridge et al., Area Summary: Patent Law Developments in the United States Court of Appeals for the Federal Circuit During 1986, 36 *Am.U.L.Rev.* 861, 887–88 (1987)). In particular, it was unclear whether a court would apply a flexible bar (as in *Hughes*) or a complete bar (as in *Kinzenbaw*). *See Festo*, 234 F.3d at 574–75.

Moreover, even if courts were consistent in applying the flexible bar in *Hughes,* parties involved in patent litigation could not be sure about the range of equivalents that a court would permit in light of the prosecution history. *See id.* Professor Chisum's definitive treatise on patent law decried the "predictive difficulties of the flexible approach." *Id.* (quoting *Chisum on Patents,* § 18.05[3][b][ii], at 18–505 to 18–506). Others noted that the Federal Circuit had not set forth the criteria for determining the effect of an amendment in "any clear or systematic way." *Festo*, 234 F.3d at 574–75 (quoting Ted Apple, Enablement Estoppel: Should Prosecution History Estoppel Arise When Claims Are Amended To Overcome Enablement Rejections?, 13 *Santa Clara Computer & High Tech L.J.* 107, 128 (1997)).

The uncertainty created by the flexible bar approach in *Hughes* (combined with the occasional revival of the conflicting complete bar approach in *Kinzenbaw*) made it particularly difficult for district courts to determine the appropriate range of equivalents when a patentee had amended her claims during prosecution. It was clear that the subject matter the patentee originally claimed (or the prior art over which she had disclaimed coverage or otherwise distinguished) bounded the outer limits of equivalence. The inner boundary was the literal reach of her claims as amended (or perhaps some point immediately beyond the claims' literal scope). *See Festo*, 234 F.3d at 574–75 ("The patentee would draw the line just at or slightly

short of the prior art, leaving a wide range of equivalents untouched by prosecution history estoppel. The accused infringer, however, would draw the line close to the literal terms of the claims, leaving little or no range of equivalents.").

The question facing a district court adjudicating an infringement suit, then, was to what range of equivalents within the subject matter between those boundaries— between the literal meaning of the patent's claims and the surrendered material or the distinguished prior art—the patentee could assert coverage. *See id.* (noting that the problem with the flexible bar approach "is that it is virtually impossible to predict before the decision on appeal where the line of surrender is drawn"). As the *Festo* court stated:

> Under the flexible bar approach . . . the exact range of equivalents when prosecution history estoppel applies is virtually unascertainable, with only the prior art marking the outer limits of the claim's scope. There is no precise metric to determine what subject matter was given up between the original claim and the amended claim.

*Festo*, 234 F.3d at 576–77; *see id.* (providing a useful example to demonstrate the difficulty of determining the proper range of equivalents). It was that uncertainty surrounding the equivalence determination that formed the backdrop of *Festo*.

## B. The Rationales for the Doctrine of Equivalents and Prosecution History Estoppel

In *Festo*, the Federal Circuit began by outlining the rationale behind the doctrine of equivalents and prosecution history estoppel. It observed that the doctrine of equivalents "prevents an accused infringer from avoiding liability for infringement by changing only minor or insubstantial details of a claimed invention while retaining the invention's essential identity." *Id.* at 563–64. The Federal Circuit also noted that the doctrine strikes a balance between fully protecting a patentee's rights and

ensuring that the claims provide the public with full notice of the scope of the patent. *See id.* The court recognized that the balance struck by the doctrine "can be easily upset, however, because 'the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement.'" *Id.* (quoting *Warner–Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040).

The court identified prosecution history estoppel as "one tool that prevents the doctrine of equivalents from vitiating the notice function of claims." *Festo,* 234 F.3d at 563–64. "The logic of prosecution history estoppel is that the patentee, during prosecution, has created a record that fairly notifies the public that the patentee has surrendered the right to claim particular matter as within the reach of the patent." *Id.* Thus, prosecution history estoppel serves two functions: "preserving the notice function of the claims and preventing patent holders from recapturing under the doctrine of equivalents subject matter that was surrendered before the Patent Office ..." *Id.* at 567.

### C. The Supreme Court's Holding in *Warner–Jenkinson*

The Federal Circuit then examined *Warner–Jenkinson.* In that opinion, the Supreme Court held that the doctrine of equivalents had survived revisions to the Patent Act in 1952. *See Warner–Jenkinson,* 520 U.S. at 25–27, 117 S.Ct. 1040. The Court expressed concern, however, that the doctrine had "taken on a life of its own," and reaffirmed that prosecution history estoppel served as a legal limitation on the doctrine of equivalents. *Id.* at 28, 30, 117 S.Ct. 1040.

In spite of its concern regarding the scope of the doctrine of equivalents, the Court declined to hold that any amendment during patent prosecution—regardless of whether the amendment was related to patentability—created prosecution history estoppel. *See id.* at 30, 117 S.Ct. 1040 (rejecting the argument that "the

reason for an amendment during patent prosecution is irrelevant to any subsequent estoppel"). Instead, the Court held that only an amendment executed for "a substantial reason related to patentability" created prosecution history estoppel. *Id.* at 33, 117 S.Ct. 1040. Where the prosecution history does not identify the reason for an amendment, the Court noted, the burden is on the patent holder to explain the purpose of the amendment. "Where no explanation is established, however, the court should presume that the patent applicant had a substantial reason related to patentability for including the limiting element added by amendment." *Id.*

### D. The Federal Circuit's Holding in *Festo*

In light of the uncertainty generated by the flexible bar approach, the functions served by the doctrine of equivalents and prosecution history estoppel, and the Supreme Court's holding in *Warner–Jenkinson* that only claim amendments executed for "a substantial reason related to patentability" created prosecution history estoppel, the Federal Circuit decided in *Festo* to adopt the complete bar approach. The majority opinion (followed by six other opinions) thereby resolved nearly twenty years of conflicting decisions and clarified that any claim amendment related to patentability was not entitled to any range of equivalents for the purposes of determining infringement.

In en banc question 1, the Federal Circuit asked whether "a substantial reason related to patentability" as outlined in *Warner–Jenkinson* was limited to amendments made to overcome prior art under 35 U.S.C. §§ 102 and 103 or whether "patentability" meant any reason affecting the issuance of a patent. *See Festo,* 234 F.3d at 563; *id.* at 565. The Federal Circuit concluded that any amendment "that narrows the scope of a claim for any reason related to the statutory requirements for a patent will give rise to prosecution history estoppel with respect to the amended

claim element." *Id.* at 564–65 (containing the court's answer to en banc question 1); *see id.* at 566–67 (concluding that amendments related to statutory requirements other than overcoming prior art also created prosecution history estoppel); *id.* ("In view of the functions of prosecution history estoppel ... we see no reason why prosecution history estoppel should not also arise from amendments made for other reasons related to patentability ...").

█ In its answers to en banc question 2 and en banc question 4, the Federal Circuit extended that logic to "voluntary" (*i.e.,* not required by the examiner or made in response to a rejection) or "unexplained" (*i.e.,* where the patentee cannot establish an explanation unrelated to patentability) amendments as well. *Id.* at 564–65 (noting that " 'voluntary' claim amendments are treated the same as other claim amendments" and that " 'unexplained' amendments are not entitled to any range of equivalents"); *see id.* at 568 ("Both voluntary amendments and amendments required by the Patent Office signal to the public that subject matter has been surrendered."); *id.* at 578–79 (noting that a court must employ the *Warner–Jenkinson* presumption that an amendment is related to patentability and that the patentee bears the burden of overcoming that presumption). Thus, after *Festo,* any amendment that narrows the scope of a claim—whether required by the PTO examiner or made by the applicant—creates prosecution history estoppel unless the patentee can establish that the amendment was made for a purpose unrelated to patentability. *See id.* at 564–65; *id.* at 567–68 ("[I]f a patent holder can show from the prosecution history that a claim amendment was not motivated by patentability concerns, the amendment will not give rise to prosecution history estoppel.").[5]

Under *Festo,* the consequence of creating prosecution history estoppel is severe: "when a claim amendment creates prosecution history estoppel, no range of equivalents is available for the amended claim element." *Id.* at 564–65 (containing the court's answer to en banc question 3); *see id.* at 569–70 ("Application of the doctrine of equivalents to the claim element is completely barred (a 'complete bar')."). The Federal Circuit observed that it decided to adopt the complete bar approach in light of "nearly twenty years of experience in performing our role as the sole court of appeals for patent matters." *Id.* at 574. The court continued: "In those years, the notice function of patent claims has become paramount, and the need for certainty as to the scope of patent protection has been emphasized." *Id.* The Federal Circuit recognized the importance of stare decisis, but viewed the current state of the law as unworkable and inconsistent with the objectives of patent law. *See id.* at 574.

Concluding that a complete bar "best serves the notice and definitional function of patent claims," the court determined that a patentee should receive no benefit of the doubt as to what was disclaimed by the amendment. *Id.* at 575–76. Instead, once a patent applicant has narrowed a claim by amendment for a reason related to patentability, that limitation's "scope of coverage will not extend beyond its literal terms. There is no speculation or uncertainty as to the exact range of equivalents that might be available." *Id.* at 577. A complete bar approach thereby enables the public and the patentee to ascertain "the true scope and value of the patent without having to resort to litigation" to determine the scope of the material the patentee surrendered during prosecution and the

**5.** The Federal Circuit also held that "a patent holder seeking to establish the reason for an amendment must base his arguments solely upon the public record of the patent's prosecution, *i.e.,* the patent's prosecution history." *Id.* at 586–87 (observing that permitting to patentee on extrinsic evidence—evidence other than the prosecution history—"would undermine the public notice function of the patent record" since the reasons for the amendment "will be known only to the patent holder").

**398**

consequent subject matter that the patent can cover under the doctrine of equivalents. *Id.; see id.* at 577–78 (noting that the complete bar approach fosters technological advances "that would have lain in the unknown, undefined zone around the literal terms of a narrowed claim under the flexible bar approach ... due to fear of litigation"); *id.* (observing that "the risk of infringement will be easier to determine").

### E. A Summary of the *Festo* Test

■ For the purpose of this summary judgment motion, it is helpful to summarize the Federal Circuit's new test for whether a claim amendment creates prosecution history estoppel and whether amendment-based estoppel bars a patentee from asserting infringement under the doctrine of equivalents for the amended claim limitations. *Festo* establishes a four-part inquiry. *See id.* at 586–87. First, a district court must determine which claim limitations are alleged to be met by equivalents. Second, the court must ascertain whether those limitations were amended during prosecution of the patent. If some of the relevant limitations were not amended, the patentee may assert infringement under the doctrine of equivalents for those unaltered limitations.[6]

Third, for the claim limitations that were amended, the court must consider whether the amendments "narrowed the literal scope of the claim." *Id.* If an amendment did not narrow the literal scope of a limitation, the patentee may still assert infringement under the doctrine of equivalents for that limitation. Fourth, if an amendment did narrow the literal scope of a claim, then the patentee bears the burden of establishing—through the prosecution history itself and not through extrinsic evidence—that the amendment was unrelated to one of the statutory requirements for patentability. If the patentee can demon-

strate that the amendment was unrelated to patentability, the amendment does not create prosecution history estoppel and the patentee may still assert infringement under the doctrine of equivalents. However, if the amendment was related to patentability or the patentee is unable to explain the reason for the amendment by citing the prosecution history alone, then amendment-based estoppel applies and application of the doctrine of equivalents is completely barred. As a result, no range of equivalents is available for the amended claim limitation, and the patentee can only establish infringement if the literal terms of the limitation read on the accused device.

### II. APPLYING *FESTO* TO THE PRESENT DISPUTE

Given the Federal Circuit's decision in *Festo* and the procedural posture of ACLARA's infringement suit, the Court decided to postpone the infringement trial to consider whether ACLARA's amendments to Claim 1 create prosecution history estoppel and therefore completely bar application of the doctrine of equivalents. If Caliper is correct that ACLARA's amendments create prosecution history estoppel and bar ACLARA from asserting infringement under the doctrine of equivalents, then Caliper is entitled to summary judgment and ACLARA's suit must be dismissed. On the other hand, if ACLARA's amendment did not create amendment-based estoppel, ACLARA may assert infringement under the doctrine of equivalents and the trial on infringement may proceed.

### A. A Preliminary *Festo* Analysis

First, the Court must determine which claim limitations are alleged to be met by equivalents. Here, after the Summary Judgment Order, ACLARA has alleged

---

6. Although the absence of an amendment precludes the application of amendment-based estoppel, a court "still may need to consider whether statements made during prosecution give rise to argument-based estoppel." *Id.* (citing *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.,* 170 F.3d 1373, 1377 (Fed.Cir. 1999)).

that both the "trench" limitation and a portion of the "plurality of electrodes" clause are infringed by equivalents.[7]

Second, the Court must ascertain whether those limitations were amended during prosecution of the patent. The prosecution history shows that ACLARA did not amend the "trench" limitation but did amend part of the "plurality of electrodes" clause. *See* ACLARA Brief, Dec. 5, 2000, at 2. Thus, ACLARA may still assert infringement under the doctrine of equivalents for the "trench" limitation, but the Court must continue the *Festo* analysis for the "plurality of electrodes" phrase. As discussed below, however, the parties dispute the precise content of the "plurality of electrodes" clause and the proper application of *Festo* to that limitation (or limitations). *See* Section II.B *infra* (identifying certain ambiguities in *Festo* regarding the scope of a claim limitation).

Third, for the claim limitation that was amended, the Court must consider whether the amendment narrowed the literal scope of the claim. ACLARA's amend-

ment to the "plurality of electrodes" phrase did narrow the literal scope of that limitation (or limitations). Prior to the amendment, Claim 1 would have reached any device in which the electrodes were "operatively connected" to the trenches, including a device in which the electrodes were insulated from contact with the medium (such as in the embodiment disclosed in the Batchelder reference). After ACLARA's amendment, however, the claim was narrowed to require the electrodes to be in direct electrical contact with the medium when the medium was present in the trenches. Again, though, the parties dispute whether that amendment narrowed the literal scope of Claim 1 as to the specific limitation of which ACLARA is asserting infringement under the doctrine of equivalents. *See* Section II.B *infra* (discussing whether the "plurality of electrodes" clause is a single limitation).

Fourth, if an amendment did narrow the literal scope of a claim, then the patentee

---

7. For the other limitations in Claim 1 of the '015 patent, ACLARA has asserted both literal infringement and infringement under the doctrine of equivalents. At this stage, only the limitations upon which the Court has granted Caliper summary judgment of non-infringement as to literal infringement generate dispositive *Festo* motions. This is so because ACLARA can only show infringement for those limitations under the doctrine of equivalents, and summary judgment for Caliper per *Festo* (*i.e.*, a determination that ACLARA's amendments create prosecution history estoppel and completely bar application of the doctrine of equivalents) would be fatal to ACLARA's infringement suit. *See Warner–Jenkinson*, 520 U.S. at 40, 117 S.Ct. 1040 (noting that a finding of non-infringement as to a single limitation in a claim defeats an infringement suit in its entirety).

On the other hand, for the limitations where ACLARA is still able to assert literal infringement in addition to infringement under the doctrine of equivalents, a *Festo* motion by Caliper would not yet be dispositive. That is so because prosecution history estoppel only limits infringement under the doctrine of equivalents; even if ACLARA amended (and narrowed) its claims for reasons related to patentability, ACLARA may

still be able to show literal infringement. If the jury finds that Caliper's products do not literally infringe the limitations that ACLARA amended, however, then the Court may be forced to consider *Festo* motions to evaluate whether ACLARA can still assert infringement under the doctrine of equivalents in light of its amendments to those limitations.

In the future presumably, parties will bring *Festo* summary judgment motions before trial to determine whether certain claim amendments create prosecution history estoppel and bar application of the doctrine of equivalents. That way, a court and the parties will know which limitations cannot be infringed under the doctrine of equivalents due to amendment-based estoppel ahead of time, and the court can issue a jury verdict form or special instructions limiting the jury to considering literal infringement as to those limitations. If a jury finds that there is no literal infringement as to a *Festo* limitation, then the jury would return (or the court could direct) a verdict for the accused infringer. Otherwise, courts will be in the position of either bifurcating trials to divide a jury's analysis of literal infringement and infringement under the doctrine of equivalents (the efficiency of which would be questionable) or entertaining *Festo* motions in the middle of trial.

bears the burden of establishing—through the prosecution history itself and not through extrinsic evidence—that the amendment was unrelated to one of the statutory requirements for patentability. There is no dispute here that ACLARA's amendment, if it narrowed the literal scope of Claim 1 as to the specific limitation of which ACLARA is asserting infringement under the doctrine of equivalents, was executed for a reason related to patentability. *See* Caliper Brief at 3; Background Section *supra* (describing ACLARA's amendment after the PTO rejection based on Batchelder). On the surface, then, ACLARA amended one of Claim 1's limitations, narrowed the literal scope of the claim, and did so for a reason related to patentability.

Thus, a preliminary *Festo* analysis suggests that ACLARA's amendment to the "plurality of electrodes" clause creates prosecution history estoppel, thereby completely barring application of the doctrine of equivalents. Caliper would therefore be entitled to summary judgment of non-infringement, and ACLARA's suit would fail. However, as the next section demonstrates, applying *Festo* is not that simple.

### B. The Question Unanswered by *Festo*

■ The central dispute on this motion is whether *Festo* applies to the "plurality of electrodes" clause as a whole or whether it applies to individual portions of the phrase. In Caliper's view, the clause is one singular, unitary limitation subject to prosecution history estoppel. ACLARA believes that the phrase actually contains several separate, independent limitations, only one of which is subject to amendment-based estoppel. In other words, the parties contest whether ACLARA's amendment—which was related to the contact between the electrodes and the medium—

creates prosecution history estoppel and bars the doctrine of equivalents as to the configuration of electrodes along the trench.

To clarify, it is useful to isolate the various components of the "plurality of electrodes" limitation. According to the Court's previous orders, the phrase "plurality of electrodes positioned to be in electrical contact with a medium when present in said trenches" contains three separate requirements: (1) there must be at least two electrodes ("the number of electrodes component"); (2) the electrodes must be in direct contact with the medium when the medium is present in the trenches, but the electrodes themselves do not have to be physically situated in the trenches ("the non-insulation component"); and (3) the electrodes must be positioned at-intermediate points along the lengthwise axis of a trench, and not just at either end of the trench ("the electrode configuration component").

ACLARA's amendment undoubtedly creates amendment-based estoppel as to the non-insulation component under *Festo*. ACLARA amended that component and narrowed its literal scope for a reason related to patentability. As a result, ACLARA is barred from asserting any range of equivalents as to the non-insulation component of the "plurality of electrodes" clause. If a jury were to find that an accused infringer's device did not literally infringe the non-insulation component (*e.g.*, the accused device insulated the electrodes from the medium or otherwise failed to place them in direct electrical contact), ACLARA would be unable to assert infringement under the doctrine of equivalents as to the non-insulation component, and ACLARA's suit would fail as a matter of law.[8]

8. Of course, because the prior art (the Batchelder reference) teaches the insulation of electrodes, ACLARA could not assert coverage over an insulated device under the doctrine of equivalents anyway. *See Marquip, Inc. v. Fosber America, Inc.*, 198 F.3d 1363, 1367

(Fed.Cir.1999) ("Based on the fundamental principle that no one deserves an exclusive right to technology already in the public domain, this court has consistently limited the doctrine of equivalents to prevent its application to ensnare prior art."); *Wilson Sporting*

However, ACLARA's amendment did not alter the electrode configuration component of the "plurality of electrodes" clause. ACLARA did not surrender any subject matter related to where along the trenches the electrodes should be placed; its amendment was limited to whether the electrodes should be insulated from the medium. If the electrode configuration component of the "plurality of electrodes" phrase is considered in isolation as a separate limitation, then, *Festo* does not bar ACLARA from asserting infringement under the doctrine of equivalents, either because ACLARA did not amend the electrode configuration component (the second step in the *Festo* test) or the amendment did not narrow the literal scope of the electrode configuration component (the third step in the *Festo* test). Thus, the central question for this Court is whether the three components in the "plurality of electrodes" clause are three separate, independent limitations or part of one single limitation.

Examining the *Festo* opinion for explicit direction is unavailing since the court couched its holding in terms of individual claim limitations. The Federal Circuit focused on whether a patentee had amended a specific limitation and whether that amendment creates prosecution history estoppel as to that limitation. The court did not face or address a situation in which a portion of claim language was amended and the parties disputed whether the amendment involved a single limitation or a series of limitations. The amendments in *Festo* also do little to resolve the issue, because those changes involved the addition or deletion of entire structures in a device rather than language describing how a specific piece of a device should be configured. *See Festo*, 234 F.3d at 587–88 (finding that an amendment narrowed a claim when the added claim element was introduced through a new claim); *id.* at 589 (finding that an amendment narrowed

a claim when the amendment substituted an independent claim that recited a certain limitation for an independent claim that did not recite that limitation).

The Federal Circuit provided some guidance in explaining its rationale for imposing a complete bar. The court indicated that a patentee should receive no benefit of the doubt as to what was disclaimed by the amendment. *See id.* at 575–76. Applying a complete bar eliminates speculation and uncertainty as to the exact range of equivalents that a patentee can assert. *See id.* at 576–77. Such a result reinforces the notice function of claims, thereby enabling the public to determine the scope of a patent without resorting to litigation and fostering innovations that might otherwise have lain dormant due to a fear of being sued for infringement. *See id.* at 576–77.

Extending the logic of *Festo* to an entire clause in a claim when only a portion of that claim has been amended, however, does not advance those goals. On one hand, a member of the public trying to ascertain the scope of ACLARA's patent by reading the prosecution history should not have to guess as to the possible range of equivalents for the non-insulation component. Under *Festo*, ACLARA's amendment narrowed the literal scope of the non-insulation component for a reason related to patentability, so the amendment creates prosecution history estoppel and bars any assertion of equivalents.

On the other hand, however, no such uncertainty was presented by the electrode configuration component of the "plurality of electrodes" clause. ACLARA never amended the claim to alter what the patent taught about the placement of electrodes. Accordingly, no potential competitor was left wondering what range of equivalents a fact finder might apply in deciding whether some other electrode configuration was substantially similar.

*Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 683 (Fed.Cir.1990) ("Even if [the substantial similarity] test is met, however,

there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art.").

The Federal Circuit's concerns about fostering innovation, reducing litigation, and minimizing the uncertainty facing the public are not implicated by ACLARA's amendment. Adopting a rule that any amendment to any portion of a clause in a claim creates prosecution history estoppel as to the entire clause and not just the portion of the clause that was amended would do little to promote the purposes of the complete bar approach.

If such an indiscriminate application of *Festo* were proper, perhaps the Federal Circuit would have extended the opinion beyond individual claim limitations. The court could have held that any amendment to any limitation in a claim bars any range of equivalents as to all of the limitations in a claim, even those that were not amended. Under such an expansive rule, once a patent applicant amended any portion of a claim for a reason related to patentability, the patentee could only claim literal infringement as to all of the limitations in the claim and would not be entitled to any range of equivalents whatsoever. That the court declined to reach so far indicates that the court was comfortable with making the public read the prosecution history carefully to see which precise segment of a claim was amended and that the court envisioned a narrower understanding of prosecution history estoppel.

Moreover, a more limited rule that evaluates closely which specific portion of claim language the patentee amended is consistent with the meaning of the term "limitation." While many courts have used the words "element" and "limitation" interchangeably in the patent context, the terms actually have separate meanings. The term "element" is "often used to refer to structural parts of the accused device or

of a device embodying the invention." Robert L. Harmon, *Patents and the Federal Circuit* § 5.6(g), at 232 (4th ed. 1998) ("Harmon") (citing *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 n. 9 (Fed.Cir.1987)). A limitation, meanwhile, is "a series of limiting words or phrases" that specifically identify the invention in the claims. Harmon § 5.6(g), at 232 (citing *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed.Cir.1989)). As such, it is more appropriate to use the term "element" in referring to an accused device and the term "limitation" in describing the claim language. *See* Harmon § 5.6(g), at 232; *Festo*, 234 F.3d at 563 n. 1 (quoted in note 2 *supra*); *Perkin–Elmer*, 822 F.2d at 1533 n. 9. This distinction is important, because the term "element" "may also be used to mean *a series of limitations that, taken together, make up a component of the claimed invention.*" Harmon § 5.6(g), at 232 (emphasis added) (citing *Corning Glass*, 868 F.2d at 1259).[9]

These authorities suggest that a single clause in a claim describing one particular physical structure (an "element" of a device embodying the invention) can contain several limitations. In other words, every clause in a claim is not a discrete limitation; instead, a clause can contain one or more limitations. In the present context, the "plurality of electrodes" phrase should be viewed as one element of a device embodying ACLARA's invention, but the three components of that clause—the number of electrodes, the lack of insulation, and the electrode configuration—are three separate, independent limitations. As such, prosecution history estoppel under *Festo* must be applied individually to each

---

9. Caliper's citation of 37 C.F.R. § 1.75(i) at oral argument does not compel a different conclusion. That section provides: "Where a claim sets forth a plurality of elements or steps, each element or step of the claim should be separated by a line indentation." 37 C.F.R. § 1.75(i) (West 2000). Caliper reads that section to mean that the entire "plurality of electrodes" clause must be read

as a single limitation or element. However, that section repeats the common mistake of using the terms "element" and "limitation" interchangeably when they actually have different meanings, and it does not suggest that an entire phrase must be regarded as a single limitation even when that phrase contains several different restrictions on the claimed invention.

of the limitations, not to the "plurality of electrodes" clause as a whole.

As a result, the Court will view each of the three limitations in the "plurality of electrodes" clause separately for the purposes of its *Festo* analysis. Because ACLARA did not amend its claims as to the electrode configuration limitation, the non-insulation amendment does not create prosecution history estoppel as to the configuration of electrodes. ACLARA may still assert infringement under the doctrine of equivalents as to that limitation (although it must show literal infringement as to the non-insulation limitation). Accordingly, Caliper's motion for summary judgment must be DENIED.

## CONCLUSION

For the foregoing reasons, Caliper's motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**